A-570-967<br>
C-570-968<br>
Remand<br>
Slip Op. 21-115<br>
**Public Document**<br>
AD/CVD Operations, OVI:  MJH

*Worldwide Door Components, Inc., v. United States*
**Court No. 19-00012, Slip. Op. 21-115 (CIT September 14, 2021)**

**Final Results of Redetermination
Pursuant to Court Remand**

**I.      Summary**

The Department of Commerce (Commerce) has prepared these final results of redetermination pursuant to the opinion and second remand order of the United States Court of International Trade (CIT or the Court) in *Worldwide Door Components, Inc. v. United States*, Court No. 19-00012, Slip Op. 21-115 (September 14, 2021) (*Worldwide II*).  This action arises out of Commerce's Final Scope Ruling that certain door thresholds imported by Worldwide Door Components, Inc. (Worldwide),[1] fall within the scope of the antidumping and countervailing duty orders on aluminum extrusions from the People's Republic of China (China).[2]  On December 23, 2020, pursuant to the CIT's first remand order in *Worldwide I*,[3] Commerce issued its Final Remand Redetermination, in which Commerce continued to find that

---

[1] *See* Memorandum, "Antidumping and Countervailing Duty Order on Aluminum Extrusions from the People's Republic of China:  Final Scope Rulings on Worldwide Door Components Inc., MJB Wood Group, Inc. and Columbia Door Thresholds," dated December 19, 2018 (Final Scope Ruling).
[2] *See Aluminum Extrusions from the People's Republic of China:  Antidumping Duty Order*, 76 FR 30650 (May 26, 2011) (*Antidumping Duty Order*); and *Aluminum Extrusions from the People's Republic of China:  Countervailing Duty Order*, 76 FR 30653 (May 26, 2011) (*Countervailing Duty Order*) (collectively, the *Orders*).
[3] *Worldwide Door Components, Inc. v. United States,* 466 F. Supp. 3d 1370 (CIT August 27, 2020) (*Worldwide I*).

Worldwide's door thresholds were included in the scope of the *Orders* as subassemblies and, therefore, fail to satisfy the requirements for the finished merchandise exclusion.[4]

In *Worldwide II*, the Court determined that Commerce impermissibly based its analysis in the Final Remand Redetermination on an inference that was contradicted or unsupported by other information on the record.[5] The CIT directed Commerce to reconsider whether Worldwide's door thresholds require cutting or machining prior to incorporation into another product, and to determine whether Worldwide's door thresholds qualified for the finished merchandise exclusion.[6]

Based on the Court's instructions, we have reconsidered whether the door thresholds meet the definition of finished merchandise set forth in the *Orders*. As described below, in this final redetermination, to comply with the CIT's second remand order, we have continued to determine under respectful protest,[7] that Worldwide's door thresholds are excluded from the *Orders* as finished merchandise.

## II.   Scope of the *Orders*

The merchandise covered by the *Orders* is aluminum extrusions which are shapes and forms, produced by an extrusion process, made from aluminum alloys having metallic elements corresponding to the alloy series designations published by The Aluminum Association commencing with the numbers 1, 3, and 6 (or proprietary equivalents or other certifying body equivalents). Specifically, the subject merchandise made from aluminum alloy with an Aluminum Association series designation commencing with the number 1 contains not less than

---

[4] *See Final Results of Redetermination Pursuant to Court Remand, Worldwide Door Components, Inc. v. United States*, Court No., 19-00012, Slip. Op. 20-128 (CIT August 27, 2020), dated December 23, 2020 (*Final Remand Redetermination*).
[5] *See Worldwide II* at 2, 18-20.
[6] *Id.* at 2, 25-26.
[7] *See Viraj Group v. United States*, 343 F. 3d 1371 (Fed. Cir. 2003).

2

99 percent aluminum by weight.  The subject merchandise made from aluminum alloy with an Aluminum Association series designation commencing with the number 3 contains manganese as the major alloying element, with manganese accounting for not more than 3.0 percent of total materials by weight.  The subject merchandise is made from an aluminum alloy with an Aluminum Association series designation commencing with the number 6 contains magnesium and silicon as the major alloying elements, with magnesium accounting for at least 0.1 percent but not more than 2.0 percent of total materials by weight, and silicon accounting for at least 0.1 percent but not more than 3.0 percent of total materials by weight.  The subject aluminum extrusions are properly identified by a four-digit alloy series without either a decimal point or leading letter.  Illustrative examples from among the approximately 160 registered alloys that may characterize the subject merchandise are as follows: 1350, 3003, and 6060.

Aluminum extrusions are produced and imported in a wide variety of shapes and forms, including, but not limited to, hollow profiles, other solid profiles, pipes, tubes, bars, and rods.

Aluminum extrusions that are drawn subsequent to extrusion (drawn aluminum) are also included in the scope.

Aluminum extrusions are produced and imported with a variety of finishes (both coatings and surface treatments), and types of fabrication.  The types of coatings and treatments applied to subject aluminum extrusions include, but are not limited to, extrusions that are mill finished (*i.e.*, without any coating or further finishing), brushed, buffed, polished, anodized (including brightdip anodized), liquid painted, or powder coated. Aluminum extrusions may also be fabricated, *i.e.*, prepared for assembly.  Such operations would include, but are not limited to, extrusions that are cut-to-length, machined, drilled, punched, notched, bent, stretched, knurled,

swedged, mitered, chamfered, threaded, and spun. The subject merchandise includes aluminum extrusions that are finished (coated, painted, *etc.*), fabricated, or any combination thereof.

Subject aluminum extrusions may be described at the time of importation as parts for final finished products that are assembled after importation, including, but not limited to, window frames, door frames, solar panels, curtain walls, or furniture. Such parts that otherwise meet the definition of aluminum extrusions are included in the scope. The scope includes the aluminum extrusion components that are attached (*e.g.*, by welding or fasteners) to form subassemblies, *i.e.*, partially assembled merchandise unless imported as part of the finished goods 'kit' defined further below. The scope does not include the non-aluminum extrusion components of subassemblies or subject kits.

Subject extrusions may be identified with reference to their end use, such as fence posts, electrical conduits, door thresholds, carpet trim, or heat sinks (that do not meet the finished heat sink exclusionary language below). Such goods are subject merchandise if they otherwise meet the scope definition, regardless of whether they are ready for use at the time of importation.

The following aluminum extrusion products are excluded: aluminum extrusions made from aluminum alloy with an Aluminum Association series designations commencing with the number 2 and containing in excess of 1.5 percent copper by weight; aluminum extrusions made from aluminum alloy with an Aluminum Association series designation commencing with the number 5 and containing in excess of 1.0 percent magnesium by weight; and aluminum extrusions made from aluminum alloy with an Aluminum Association series designation commencing with the number 7 and containing in excess of 2.0 percent zinc by weight.

The scope also excludes finished merchandise containing aluminum extrusions as parts that are fully and permanently assembled and completed at the time of entry, such as finished

windows with glass, doors with glass or vinyl, picture frames with glass pane and backing material, and solar panels. The scope also excludes finished goods containing aluminum extrusions that are entered unassembled in a "finished goods kit." A finished goods kit is understood to mean a packaged combination of parts that contains, at the time of importation, all of the necessary parts to fully assemble a final finished good and requires no further finishing or fabrication, such as cutting or punching, and is assembled "as is" into a finished product. An imported product will not be considered a "finished goods kit" and therefore excluded from the scope of the *Orders* merely by including fasteners such as screws, bolts, *etc.* in the packaging with an aluminum extrusion product.

The scope also excludes aluminum alloy sheet or plates produced by other than the extrusion process, such as aluminum products produced by a method of casting. Cast aluminum products are properly identified by four digits with a decimal point between the third and fourth digit. A letter may also precede the four digits. The following Aluminum Association designations are representative of aluminum alloys for casting: 208.0, 295.0, 308.0, 355.0, C355.0, 356.0, A356.0, A357.0, 360.0, 366.0, 380.0, A380.0, 413.0, 443.0, 514.0, 518.1, and 712.0. The scope also excludes pure, unwrought aluminum in any form.

The scope also excludes collapsible tubular containers composed of metallic elements corresponding to alloy code 1080A as designated by the Aluminum Association where the tubular container (excluding the nozzle) meets each of the following dimensional characteristics:

(1) length of 37 millimeters ("mm") or 62 mm,

(2) outer diameter of 11.0 mm or 12.7 mm, and

(3) wall thickness not exceeding 0.13 mm.

Also excluded from the scope of the *Orders* are finished heat sinks. Finished heat sinks are fabricated heat sinks made from aluminum extrusions the design and production of which are organized around meeting certain specified thermal performance requirements and which have been fully, albeit not necessarily individually, tested to comply with such requirements.

Imports of the subject merchandise are provided for under the following categories of the Harmonized Tariff Schedule of the United States (HTSUS): 6603.90.8100, 7616.99.51, 8479.89.94, 8481.90.9060, 8481.90.9085, 9031.90.9195, 8424.90.9080, 9405.99.4020, 9031.90.90.95, 7616.10.90.90, 7609.00.00, 7610.10.00, 7610.90.00, 7615.10.30, 7615.10.71, 7615.10.91, 7615.19.10, 7615.19.30, 7615.19.50, 7615.19.70, 7615.19.90, 7615.20.00, 7616.99.10, 7616.99.50, 8479.89.98, 8479.90.94, 8513.90.20, 9403.10.00, 9403.20.00, 7604.21.00.00, 7604.29.10.00, 7604.29.30.10, 7604.29.30.50, 7604.29.50.30, 7604.29.50.60, 7608.20.00.30, 7608.20.00.90, 8302.10.30.00, 8302.10.60.30, 8302.10.60.60, 8302.10.60.90, 8302.20.00.00, 8302.30.30.10, 8302.30.30.60, 8302.41.30.00, 8302.41.60.15, 8302.41.60.45, 8302.41.60.50, 8302.41.60.80, 8302.42.30.10, 8302.42.30.15, 8302.42.30.65, 8302.49.60.35, 8302.49.60.45, 8302.49.60.55, 8302.49.60.85, 8302.50.00.00, 8302.60.90.00, 8305.10.00.50, 8306.30.00.00, 8414.59.60.90, 8415.90.80.45, 8418.99.80.05, 8418.99.80.50, 8418.99.80.60, 8419.90.10.00, 8422.90.06.40, 8473.30.20.00, 8473.30.51.00, 8479.90.85.00, 8486.90.00.00, 8487.90.00.80, 8503.00.95.20, 8508.70.00.00, 8515.90.20.00, 8516.90.50.00, 8516.90.80.50, 8517.70.00.00, 8529.90.73.00, 8529.90.97.60, 8536.90.80.85, 8538.10.00.00, 8543.90.88.80, 8708.29.50.60, 8708.80.65.90, 8803.30.00.60, 9013.90.50.00, 9013.90.90.00, 9401.90.50.81, 9403.90.10.40, 9403.90.10.50, 9403.90.10.85, 9403.90.25.40, 9403.90.25.80, 9403.90.40.05, 9403.90.40.10, 9403.90.40.60, 9403.90.50.05, 9403.90.50.10, 9403.90.50.80, 9403.90.60.05, 9403.90.60.10, 9403.90.60.80, 9403.90.70.05, 9403.90.70.10, 9403.90.70.80, 9403.90.80.10,

9403.90.80.15, 9403.90.80.20, 9403.90.80.41, 9403.90.80.51, 9403.90.80.61, 9506.11.40.80, 9506.51.40.00, 9506.51.60.00, 9506.59.40.40, 9506.70.20.90, 9506.91.00.10, 9506.91.00.20, 9506.91.00.30, 9506.99.05.10, 9506.99.05.20, 9506.99.05.30, 9506.99.15.00, 9506.99.20.00, 9506.99.25.80, 9506.99.28.00, 9506.99.55.00, 9506.99.60.80, 9507.30.20.00, 9507.30.40.00, 9507.30.60.00, 9507.90.60.00, and 9603.90.80.50.

The subject merchandise entered as parts of other aluminum products may be classifiable under the following additional Chapter 76 subheadings: 7610.10, 7610.90, 7615.19, 7615.20, and 7616.99, as well as under other HTSUS chapters. In addition, fin evaporator coils may be classifiable under HTSUS numbers: 8418.99.80.50 and 8418.99.80.60. While HTSUS subheadings are provided for convenience and customs purposes, the written description of the scope of the *Orders* is dispositive.

### III. Background

Worldwide's door thresholds contain a combination of aluminum extrusions and non-aluminum components such as synthetic plastic polymers such as polyvinyl chloride (PVC), polyethylene, polyurethane, polypropylene or thermoplastic elastomer, wood, and stainless steel.[8] In the Final Scope Ruling on Worldwide's door thresholds, we found that the door thresholds were covered by the scope of the *Orders* based on the scope language and sources described in 19 CFR 351.225(k)(1).[9] Specifically, we determined that Worldwide's door thresholds fell under the general scope provisions covering parts for final finished products (*i.e.*, parts for doors) that are assembled after importation; identified subject extrusions with reference to their end-use with door thresholds listed as a specific example; and covered subassemblies.[10]

---

[8] *See* Worldwide's Letter, "Response to Supplemental Questionnaire on Scope Ruling Request for Worldwide Door Thresholds," dated November 7, 2017 at 3.
[9] *See* Final Scope Ruling at 32-37.
[10] *Id.* at 33-34.

After finding that the door thresholds were covered by the general scope language of the *Orders*, we determined that the finished merchandise exclusion was inapposite.[11]

Worldwide challenged Commerce's scope rulings and, on August 27, 2020, in *Worldwide I*, the CIT held that Commerce misinterpreted the factors specified in 19 CFR 351.225(k)(1) and the scope provisions covering parts for final finished products and identifying subject extrusions with reference to their end-use.[12] Although the Court acknowledged that the scope includes subassemblies composed of aluminum and non-aluminum components,[13] it did not explicitly rule on Commerce's finding that Worldwide's door thresholds are subassemblies.[14] The Court remanded Commerce's scope ruling for consideration of whether the finished merchandise exclusion applies to Worldwide's door thresholds.[15]

In the Final Remand Redetermination, Commerce continued to find that Worldwide's door thresholds were included in the scope of the *Orders* as subassemblies.[16] Commerce reasoned that the door thresholds were partially assembled, intermediate products that did not function on their own, but were designed to be incorporated into a larger downstream product, such as a door frame, completed door unit, or residential or commercial building.[17] Because Commerce found that the door thresholds were subassemblies, it concluded that the finished merchandise exclusion was inapplicable.[18]

In *Worldwide II*, the CIT ruled that Commerce impermissibly made findings in its Final Remand Redetermination which were based on an inference that was contradicted or

---

[11] *Id.* at 35-36.
[12] *See Worldwide Door Components,* 466 F. Supp. 3d at 1373-1376.
[13] *Id.* at 1380.
[14] *Id.* at 1375.
[15] *Id.* at 1380.
[16] *See* Final Remand Redetermination at 22-26.
[17] *Id.* at 23-24.
[18] *Id.* at 26.

8

unsupported by other information on the record.[19]  Specifically, in support of its conclusion that Worldwide's door thresholds are not in and of themselves finished products, but intermediary products incorporated into larger finished merchandise, Commerce cited record evidence stating that door thresholds generally require cutting and fabrication prior to installation.[20]  The CIT concluded that these statements inferred but did not clearly state that Worldwide's door thresholds were also customizable intermediate products, and were contradictory to Worldwide's characterization of its door thresholds as "fully assembled at the time of entry…{and} ready for installation within a door frame, or residential or commercial building without any further finishing or fabrication."[21]  Because Commerce's determination cited this general characterization of door thresholds requiring further cutting or manufacturing, the CIT remanded Commerce's decision to reconsider its factual findings regarding whether Worldwide's door thresholds require further processing before incorporation with other products.[22]

In *Worldwide II*, the CIT also stated that the language of the finished merchandise exclusion lists "doors with glass or vinyl" – but not door units – as exemplars of finished merchandise.[23]  In its Final Remand Redetermination, Commerce concluded that the exemplars in the finished merchandise exclusion were not subassemblies because the scope specifically defined them as finished merchandise.[24]  The CIT interpreted Commerce' conclusion to mean that because only products that were not intended to be incorporated into a larger downstream product could qualify as finished merchandise, Commerce was interpreting "doors with glass or vinyl" to be the downstream door unit, even without the additional components comprising a

---

[19] *See Worldwide II* at 2, 18-20.
[20] *See* Final Remand Redetermination at 36-37.
[21] *See Worldwide II* at 19-20.
[22] *Id.* at 21-22, 25.
[23] *Id.* at 23-24.
[24] *See* Final Remand Redetermination at 18.

9

door unit.[25]  The CIT thus held that Commerce improperly redefined the scope language, which references only "doors with glass or vinyl," and not door units or other downstream products into which the doors might be incorporated.[26]  The CIT also stated that Commerce had not sufficiently considered why "doors with glass or vinyl" – which, like door thresholds, were not part of a larger downstream product – could satisfy the finished merchandise exclusion, but Worldwide's door thresholds could not.[27]  Accordingly, the CIT directed Commerce on remand to determine whether Worldwide's door thresholds qualified for the finished merchandise exclusion.[28]

On November 18, 2021, we released our Draft Results of Redetermination to interested parties.[29]  On November 29, 2021, we received comments from the petitioner[30] and Endura Products, Inc. (Endura).[31]  We respond to these comments below.  After considering these comments and the Court's opinion and analysis in *Worldwide II*, we continue to find, under respectful protest, that Worldwide's door thresholds are excluded from the *Orders* as finished merchandise.

**IV.    Analysis Regarding the "Finished Merchandise Exclusion"**

In remanding this issue to Commerce, the Court ordered Commerce to reconsider its determination that Worldwide's door thresholds were within the scope of the *Orders*.  As discussed above, in both the Final Scope Ruling and First Redetermination, Commerce found

---

[25] *See Worldwide II* at 24.
[26] *Id.* at 23-24.
[27] *Id.* at 24-25.
[28] *Id.* at 25-26.
[29] *See* Draft Results of Redetermination, *Worldwide Door Components, Inc. v. United States*, Court No. 19-00012, Slip. Op. 21-115 (CIT September 14, 2021), dated November 18, 2021 (Draft Results of Redetermination).
[30] The petitioner is the Aluminum Extrusions Fair Trade Committee.
[31] *See* Petitioner and Endura's Letter, "Aluminum Extrusions from the People's Republic of China: Comments on Draft Results of Redetermination," dated November 29, 2021 (Petitioner and Endura Draft Redetermination Comments).

that Worldwide's door thresholds were subassemblies which were included in the scope of the *Orders*.[32]

However, in *Worldwide II*, the Court found unpersuasive Commerce's determination that Worldwide's door thresholds were subassemblies which must be further incorporated into a larger downstream product (*e.g.*, a door unit or door frame). Specifically, the Court determined in *Worldwide II* that record evidence did not support the conclusion that Worldwide's door thresholds must undergo further cutting or fabrication in order to be incorporated into a completed product.[33] The Court also held that Commerce misinterpreted the scope language in concluding that, because Worldwide's door thresholds were intermediate products, rather than final finished goods in and of themselves, the finished merchandise exclusion was inapplicable.[34] Thus, the Court disagreed with Commerce's finding that Worldwide's door thresholds were subassemblies covered by the scope of the *Orders* and not excluded under the finished merchandise exclusion.

Although we disagree with the Court's interpretation of the scope language, consistent with the Court's opinion and analysis, we find, under respectful protest,[35] that Worldwide's door thresholds are not subassemblies covered by the general scope language, and that they satisfy the criteria for the finished merchandise exclusion. Specifically, the Court concluded that the record evidence does not support Commerce's finding that Worldwide's door thresholds are subassemblies covered by the general scope language.[36] The Court also directed us to consider whether Worldwide's door thresholds satisfy the criteria of the finished merchandise exclusion,

---

[32] *See* Final Scope Ruling at 34; *see also* Final Remand Redetermination at 22-26.
[33] *See Worldwide II* at 19-20.
[34] *Id.* at 22-25.
[35] *See Viraj Group Ltd.*, 343 F.3d at 1376-77.
[36] *See Worldwide II* at 18-22.

which provides: "The scope also excludes finished merchandise containing aluminum extrusions as parts that are fully and permanently assembled and completed at the time of entry, such as finished windows with glass, doors with glass or vinyl, picture frames with glass pane and backing material, and solar panels."[37]  The Court stated that Worldwide's door thresholds are similar to the exemplars provided in the finished merchandise exclusion – *e.g.*, doors with glass or vinyl – in that the exemplars are also not incorporated into a larger downstream product such as a door unit or other structure.[38]  Accordingly, consistent with the Court's reasoning, we are finding, under respectful protest, that Worldwide's door thresholds are finished merchandise excluded from the *Orders*.

**V.      Interested Party Comments on Draft Results of Redetermination**

**Comment 1:   Whether Worldwide's Door Thresholds are Subassemblies or Excluded from the Orders under the Finished Merchandise Exclusion**

*The Petitioner and Endura's Comments:*

- The petitioner and Endura acknowledge that Commerce conducted the Draft Results of Redetermination under protest.  However, the petitioner and Endura argue Commerce provided insufficient rationale in the Draft Results of Redetermination both to (1) support Commerce's disagreement with the Court's interpretation of the scope of the *Orders* and (2) explain the decision made in the Final Remand Redetermination in *Worldwide I* that Worldwide's door thresholds are subassemblies included within the scope of the *Orders*.[39]

- The petitioner and Endura argue that in both the Final Scope Ruling and in the Final Remand Redetermination in *Worldwide I*, Commerce properly concluded that the merchandise in question are subassemblies which fail to meet exclusion from the *Orders* pursuant to the

---

[37] *See* the *Orders*.
[38] *See Worldwide II* at 23-25.
[39] *See* Petitioner and Endura Draft Redetermination Comments at 2.

"finished merchandise provision" of the scope.[40]  The petitioner and Endura assert that in these Final Results of Redetermination, Commerce should reiterate to the Court that, contrary to analysis set forth in *Worldwide II*, the merchandise in question are subassemblies that fail to meet exclusion as finished merchandise.[41]

- The petitioner and Endura contend that in *Worldwide II*, the Court has impermissibly substituted its judgment for that of the agency.  The petitioner and Endura argue that the definition of subassemblies adopted by Commerce in the Final Remand Redetermination in *Worldwide I* is consistent with the analysis set forth by Commerce in response to *Meridian*.[42]

- The petitioner and Endura further contend that the Court's opinion in *Worldwide II* improperly expands the finished merchandise exclusion of the *Orders* to read the subassembly language out of the scope.  The petitioner and Endura note that under the finished merchandise exclusion of the *Orders,* subassemblies are ineligible for exclusion.[43] Moreover, the petitioner and Endura assert that the "exemplars" of excluded finished merchandise cited by the Court in *Worldwide II* (*e.g.*, finished windows with glass or doors with glass or vinyl) are themselves mentioned within the finished merchandise exclusion. Therefore, in and of themselves, finished windows with glass or doors with glass or vinyl are "finished merchandise" which unlike door thresholds require no further analysis as to whether they are excluded under the finished merchandise exclusion of the *Orders*.[44]

- Because Worldwide's door thresholds do not function on their own but rather as part of a completed door, the petitioner and Endura continue to maintain that door thresholds are not

---

[40] *Id* at 3.
[41] *Id.*
[42] *Id*. at 5 (citing *Meridian Products LLC v. United States* Court No. 13-00246, Slip Op, 19-5 (CIT January 14, 2019) (May 15, 2019) at 30-31 (*Meridian*)).
[43] *See* Petitioner and Endura Draft Redetermination Comments at 5-8.
[44] *Id.* at 8.

fully and completely assembled products at the time of importation.[45]  Further, the petitioner and Endura assert that door thresholds require further cutting and fabrication before these items can be incorporated into a finished door frame.[46]

- The petitioner and Endura conclude that by accepting Worldwide's contention that its door thresholds require no further cutting or fabrication subsequent to their importation, the Court has impermissibly substituted its own judgment for that of Commerce.  The petitioner and Endura further assert that the Court has inappropriately overlooked record evidence which establishes that door thresholds require customization and further cutting and fabrication.[47]

**Commerce's Position:**

As stated above, in the Final Scope Ruling and the Final Remand Redetermination in *Worldwide I*, Commerce determined that Worldwide's door thresholds are subassemblies covered by the scope of the *Orders* and, thus, do not satisfy the criteria of the finished merchandise exclusion.[48]

The Court determined in *Worldwide II* that record evidence did not support Commerce's conclusion that Worldwide's door thresholds are subassemblies because they must undergo further cutting or fabrication in order to be incorporated into a completed product.[49]  Specifically, the Court cited to Worldwide's characterization of its door thresholds as assemblies that are ready for use without further processing and incapable of being cut to custom sizes without destroying the thresholds' functionality.[50]  However, the fact that the door thresholds themselves may not have undergone further cutting or fabrication was not central to Commerce's original

---

[45] *Id.* at 9-10.
[46] *Id.* at 10-11 (citing Petitioner and Endura's Letter, "Aluminum Extrusions from the People's Republic of China: Submission of Exhibits," dated September 4, 2018) at Exhibit 2).
[47] *Id.* at 13-15.
[48] *See* Final Scope Ruling at 32-37; *see also* Final Remand Redetermination at 22-26.
[49] *See Worldwide II* at 14-17.
[50] *Id.* at 19.

14

analysis finding that the door thresholds were subassemblies based on the further assembly and incorporation of other components/parts to form downstream finished merchandise.[51] The central question Commerce analyzed was not whether record evidence indicates the door thresholds themselves may undergo further cutting or fabrication, but whether they are intermediate products that require further incorporation of other components to form a downstream finished product.[52]

In addition, the Court also held that Commerce misinterpreted the scope language in concluding that, because Columbia's door thresholds were intermediate products, rather than final finished goods in and of themselves, the finished merchandise exclusion was inapplicable.[53] The Court stated that Worldwide's door thresholds are similar to the exemplars provided in the finished merchandise exclusion – *e.g.*, doors with glass or vinyl – in that the exemplars are also incorporated into a larger downstream products such as a door unit or other structure.[54] Thus, the Court disagreed with Commerce's finding that Worldwide's door thresholds were subassemblies covered by the scope of the *Orders* and not excluded under the finished merchandise exclusion. However, Commerce's analysis identified the fact that door thresholds are specifically identified as an exemplar of in-scope subject merchandise in the scope language, while items such as doors with glass or vinyl are specifically identified as an exemplar of excluded finished merchandise.[55] In addition, Commerce explained its finding that a door threshold "may be described as a part for a door, while the finished merchandise exclusion expressly covers finished 'doors with glass or

---

[51] *See* Final Scope Ruling at 33, 37.
[52] *See* First Remand Redetermination at 25 ("{w}e find whether the door thresholds are inherently part of a larger whole is relevant in determining if the thresholds are either excluded finished goods or included subassemblies.")
[53] *See Worldwide II* at 18-23.
[54] *Id.* at 17-22.
[55] *See* Final Scope Ruling at 35-36 ("{F}inding door thresholds excluded under the finished merchandise exclusion would render the express inclusion of 'door thresholds' meaningless.")

vinyl.'"[56] Therefore, Commerce distinguished the door thresholds from the listed exemplars in the finished merchandise exclusion by determining that the door thresholds are an intermediary product (part) to be later incorporated into a finished downstream product, here a door unit. Thus, Commerce has previously identified key distinctions between these products.

In any event, although Commerce respectfully disagrees with the Court's interpretation of the scope language, consistent with the Court's opinion and analysis, we continue to find in these Final Results of Redetermination that Worldwide's door thresholds are finished merchandise excluded from the scope of the *Orders*, under protest.

## VI. Final Results of Redetermination

As a result of this redetermination, we have determined, under protest, that Worldwide's door thresholds are outside the scope of the *Orders* pursuant to the finished merchandise exclusion. Should the Court sustain these Final Results of Redetermination, we will issue a revised scope ruling accordingly.

12/13/2021

X  _[signature]_

Signed by: RYAN MAJERUS

---

Ryan Majerus
Deputy Assistant Secretary
  for Policy and Negotiations
  Performing the Non-Exclusive Functions and Duties
  of the Assistant Secretary for Enforcement and Compliance

---

[56] *Id.*